HANOVER NEW ENGLAND INSURANCE COMPANY *vs.*
GEORGE SMITH & another.[1]

No. 91-P-492.

Norfolk. October 20, 1992. - October 19, 1993.

Present: ARMSTRONG, PERRETTA, & IRELAND, JJ.

*Insurance*, Homeowner's insurance, Coverage, Construction of policy, Pollution exclusion clause.

The release of contaminants exclusion in a policy of homeowner's insurance excluded coverage of damage to a dwelling house, which occurred as the direct result of an escape of home heating oil from the oil burner in the dwelling. [419-421]

CIVIL ACTION commenced in the Superior Court Department on April 3, 1989.

The case was heard by *Robert W. Banks*, J., on motions for summary judgment.

*John A. Leslie* for the plaintiff.
*Ian S. Oppenheim* for the defendants.

ARMSTRONG, J. The defendants made a claim under their homeowners' policy for damage caused by a release of heating oil in their cellar. The insurer denied coverage and filed this action for declaratory relief to confirm the correctness of its position. The judge found for the homeowners, and the insurer appealed.

The damage was caused by the malfunction of an electrical relay switch in the defendants' oil burner, which was supposed to shut off the flow of oil when the burner was not igniting. Oil accumulated in the combustion chamber of the furnace, leaked through and permeated the insulation around the furnace, then escaped to the cellar floor where it puddled

---

[1] Ann Smith.

and traveled under (and into) the sheetrock partitioning of the family room. The defendants' claim is for the loss of the furnace, the partitioning, and the family room floor and carpet, all of which must be replaced, as well as unspecified family room furnishings.

The insurer denied coverage based on two policy exclusions appearing in the "Perils Insured Against" section of the policy. One exclusion is for losses directly "caused by . . . inherent vice, latent defect, mechanical breakdown." The other is for losses directly "caused by . . . release, discharge, or dispersal of contaminants or pollutants." Unlike another section of the policy, entitled "Section I — Exclusions," which excludes losses caused "directly or indirectly" by the causes listed thereunder, the exclusions listed in the "Perils Insured Against" section of the policy do not apply to losses indirectly resulting from the listed causes: "Under items 1 and 2 [which include the two quoted exclusions], any ensuing loss to property described in Coverages A [dwelling] and B [other structures] *not excluded or excepted in this policy* is covered" (emphasis added).

The judge ruled that the exclusion for losses directly caused by mechanical breakdown was inapplicable because the breakdown of the relay safety switch was electrical, not mechanical, and that the dispersal of contaminants exclusion was inapplicable both because the differentiation between "direct" losses and "ensuing" losses is inherently ambiguous and because of the "principle that recovery on an insurance policy is allowed 'where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.' " *Standard Elec. Supply Co.* v. *Norfolk & Dedham Mut. Fire Ins. Co.*, 1 Mass. App. Ct. 762, 765-766 (1974), quoting from 5 Appleman, Insurance Law and Practice § 3083, at 311 (1970). (This principle is most recently discussed in detail and reaffirmed in *Jussim* v. *Massachusetts Bay Ins. Co.*, 415 Mass. 24, 26-30 [1993].)

It is unnecessary to decide whether the judge was correct in treating the mechanical breakdown exclusion as inapplicable to the claim, either for the reason he gave or for the rea-

son, argued by the defendants, that the claimed losses were ensuing, not direct, losses in relation to the malfunction of the oil flow safety switch (that is, according to this argument, that the malfunction of the switch was the direct cause of the oil release, and the oil release, in turn, was the direct or immediate cause of the damage to the furnace insulation, the partition, and the family room).

We concentrate instead on the application of the release of contaminants exclusion, which we have concluded is controlling under the conceptual structure of this particular policy. We begin by assuming, with the parties and the judge, that a release of home heating oil is a release of a contaminant within the meaning of the policy.[2] As applied to this exclusion (as well as the mechanical breakdown exclusion), the policy differentiates between direct losses, i.e., losses directly caused by the release of the oil, which are not covered, and ensuing losses, which we take to mean losses indirectly caused by release of the oil, which are covered. In practical application, we understand the policy to mean that when released oil spreads to soil or building components or personal property, with the result that they become noxious, dysfunctional, or even hazardous, that loss must be regarded as the direct result of the oil release. Indirect or "ensuing" losses would include those resulting from a fire caused by the presence of the oil or from a collapse or spill caused by the disintegration of oil-soaked structural components or the presence of slippery surfaces.

Policy exclusions that differentiate between direct and ensuing losses cannot be analyzed under the commonly applied "train of events test" (*Standard Elec. Supply Co.* v. *Norfolk*

---

[2]The judge accepted that proposition, citing as authority *American Cas. Co.* v. *Myrick*, 304 F.2d 179 (5th Cir. 1962); *Hi-G, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 283 F. Supp. 211, 212-213 (D. Mass. 1967); *Auten* v. *Employers Natl. Ins. Co.*, 722 S.W.2d 468 (Tex. Ct. App. 1986). The recent decision in *Jussim* v. *Massachusetts Bay Ins. Co.*, 415 Mass. 24 (1993), cited in the text, involved a spill of home heating oil and a tacit assumption, not material to the outcome, that such a spill was comprehended by an exclusion for "loss . . . caused by . . . release, discharge or dispersal of contaminants or pollutants." *Id.* at 26.

& *Dedham Mut. Fire Ins. Co.*, 1 Mass. App. Ct. at 766)
that differentiates between "the cause or agency which is
nearest in time or place to the result," on the one hand, and
the "active efficient cause" or "efficient proximate cause" on
the other, the latter being the cause that sets in motion the
train of events leading to the claimed loss. *Jussim* v. *Massa-
chusetts Bay Ins. Co.*, 415 Mass. at 27. These concepts are
all discussed in detail in the *Jussim* case, *supra* at 26-30,
where the authorities are reviewed and clarified. The test has
been used to distinguish, in the succinct language of *Bet-
tigole* v. *American Employers Ins. Co.*, 30 Mass. App.
Ct. 272, 276 (1991), "between an excluded event which
causes a loss . . ., and a covered event which causes a loss in
the form of an excluded event." Where the train of events
test applies, an insurer is held liable on a loss immediately
produced by an excluded cause, if it was in turn produced by
a covered cause. Thus, in the recent *Jussim* case, *supra* at
28-30, the insured was held covered for losses caused by a
seepage of oil from his neighbor's cellar, despite a release of
contaminants exclusion in his policy, because the oil spill in
the neighbor's cellar was the result of a covered cause, negli-
gence. The covered cause was treated under the train of
events test as the "efficient proximate cause" of the insured's
loss. *Id.* at 30.

The *Jussim* decision recognizes that the train of events test
is not a principle of law that applies regardless of the policy
language, and it suggests that an insurer which seeks a total
exclusion of losses caused by a release of contaminants state
in its policy — perhaps by placement within the general ex-
clusions section of the policy — that the insurance does not
apply to losses caused "directly or indirectly" by contami-
nants and that "such [a] loss is excluded regardless of any
other cause or event contributing concurrently or in any se-
quence to the loss." *Id.* at 30-31.

Although not so broadly exclusionary as the language sug-
gested in *Jussim*, the distinction made in this policy between
direct losses and ensuing losses cuts across the train of events
analysis, separately indicating the legal effect of each succes-

sive causal step in the train. The "ensuing losses" sentence makes explicit (by the language emphasized in the test just referred to above) that ensuing losses will be covered, even if the original cause (or, in terms of the train of events test, the "efficient proximate cause") is excluded, provided that the ensuing loss is not one that is itself excluded. Thus, a loss to a dwelling directly (i.e., immediately) caused by the release of a contaminant is an excluded loss. This excludes losses of the type suffered here. An ensuing loss — if, for example, the oil spill caused a fire — would be covered.[3]

It is true, as the defendants argue, that an exclusion of losses due to release of contaminants could comprehend a wide array of household accidents ("spills of . . . chlorine bleach, rug cleaners, furniture polishes, pet care products, and even air fresheners"), but in many of these cases the resulting losses would be encompassed by "Coverage C — Personal Property," which in this policy has its own separate set of exclusions and is not subject to exclusion of losses caused by the release of contaminants.

The bases on which the parties respectively moved for summary judgment did not call for them to distinguish between losses to property under "Coverage A — Dwelling" and losses to property under "Coverage C — Personal Property." The stipulation of facts indicates that losses were suffered to carpeting and family room furnishings. The judgment is reversed. The case is remanded for the entry of a declaration that the defendants are not entitled to recover for losses to property carried under coverage A and for further proceedings to determine what amount, if any, the defendants might be entitled to recover for losses to property carried under coverage C.

*So ordered.*

---

[3]Note that the fire loss would probably be excluded under the more broadly exclusionary language suggested in the *Jussim* decision.