Jeanne FARRELL and Stephen Reinhold

v.

ROYAL INSURANCE COMPANY
OF AMERICA.

No. 394CV32 JBA.

United States District Court,
D. Connecticut.

March 31, 1997.

Alan Neigher, Byelas & Neigher, Westport, CT, Judith Migdal Trutt, Ridgefield, CT, for Plaintiffs.

Daniel P. Scapellati, Halloran & Sage, Hartford, CT, for Defendant.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT
#### [doc. # 14, doc. # 19]

ARTERTON, District Judge.

Plaintiffs, Jeanne Farrell and Stephen Reinhold, brought this action seeking insurance coverage under a first-party home-owners' policy issued by defendant, Royal Insurance Company of America, for damages to their property which they claim arose from a misdelivery of fuel oil to the wrong tank, resulting in oil "discharge into the foundation and drainage system of plaintiffs' residence requiring excavation and reconstruction of the foundation and basement of plaintiffs' home." (Compl. ¶ 8.) Specifically, plaintiffs' complaint alleges breach of implied covenant of good faith and fair dealing (count one); and breach of contract (count four).[1]

In its amended answer to the complaint, defendant asserts three affirmative defenses at issue on Plaintiffs' Motion for Summary Judgment. The first affirmative defense claims that the policy does not cover damage to land. The second and third affirmative defenses reference specific policy exclusions.[2]

Defendant opposes and itself moves for summary judgment on both counts of the complaint. In light of the following discus-

---

1. Counts Two and Three have been withdrawn.

2. A fourth affirmative defense asserts plaintiffs' failure to state a claim upon which relief may be granted. Plaintiffs do not move for summary judgment on this affirmative defense claiming that they are unaware of the basis for it.

sion, plaintiffs' motion will be granted in part and defendant's motion will be granted in part.

### Facts

The facts in this case are largely undisputed. Plaintiffs reside at 10 Hillyfield Lane, Westport, Connecticut. Defendant is an Illinois corporation authorized to issue first party home casualty insurance policies in the State of Connecticut. During all relevant times, plaintiffs had in effect a homeowners' policy of insurance, # RKGMW8642, issued by defendant, the relevant portions of which are set forth in the Court's discussion below.

Non-party Santa Fuel Company of Bridgeport, Connecticut ("Santa Fuel"—see fn. 4 *infra*) customarily made deliveries of fuel oil to an active underground tank on plaintiffs' premises. Plaintiffs, though unaware, also had two inactive underground fuel tanks on their property ("Tank 1" and "Tank 2"). On December 10, 1992, Santa Fuel mistakenly delivered 269 gallons of fuel oil to Tank 1. Shortly after delivery, plaintiffs noticed a strong odor of fuel oil in the basement of their house. They called Santa Fuel who returned to plaintiffs' residence and attempted to pump out the fuel it had delivered to the wrong tank.

Plaintiffs claim that despite Santa Fuel's attempt at removal, the fuel oil had already been discharged into the foundation and drainage system of the plaintiffs' basement and the soil and surface water in and around their house, causing extensive property damage. Plaintiffs excavated and reconstructed a substantial portion of the foundation and basement of their residence. On December 15, 1992, Santa Fuel hired American Environmental Technologies Inc. ("AET") to excavate and remove Tank 1. Incident to the excavation and removal, and the foundation reconstruction was testing of soil and removal and disposal of contaminated soil, as well

as replacement of earth to fill in the removed tank areas. Plaintiffs hired Enviroshield, Inc., to conduct further testing of the soil and develop a remediation plan. The investigation and removal of Tank 1 led to the discovery of Tank 2. On January 6, 199[3], the Department of Fire Services in Westport issued a notice[3] to plaintiffs regarding an improperly abandoned underground storage tank on the subject premises that, by law, plaintiffs were required to properly remove or abandon. On January 15, 1993, plaintiffs hired U.S. Tank Tech. to excavate and remove Tank 2. Santa Fuel hired AET to observe the removal. Upon removal, signs of corrosion were evident.

Enviroshield and AET issued conflicting reports as to the cause of the fuel oil odor in plaintiffs' basement. In the opinion of Enviroshield, Santa Fuel's incorrectly filling Tank 1 created a syphon effect which, in turn, caused leaking of oil into the foundation walls through the cut return/feed lines. AET, on the other hand, opined that the odor in plaintiffs' house was due to oil which had leaked from Tank 2 as a result of the tank's corroded state.

Plaintiffs referred the claim to defendant who denied coverage on February 3, 1993 on the grounds that plaintiffs' damages were due to the release, discharge, and disbursal of oil which is a specifically excluded peril under the terms of the policy. Plaintiffs then brought this action in state court against defendant which defendant subsequently removed to this Court under its diversity jurisdiction. Based on their claim that the accident of Santa Fuel's misdelivery is the covered occurrence, plaintiffs claim coverage for various property damages including the costs associated with the removal of fuel oil and related testing, excavation, and disposal of contaminated soil, landscaping, excavation and reconstruction of the foundation, and removal of Tank 2,[4] as well as costs,

---

**3.** The notice has a date of January 6, 1992. However, plaintiffs have not objected to defendant's contention that this notice was sent during the relevant time period. In his deposition, plaintiff Stephen Reinhold states that when this tank was removed in January 1993, the Fire Department was present. Transcript from Reinhold Deposition, Memorandum of Law in Oppo-

sition to Plaintiffs' Motion for Summary Judgment, Exh. C at 32–33.

**4.** Plaintiffs have also filed a state court action against Santa Fuel for *inter alia*, negligence and breach of contract. Santa Fuel has defended primarily on the theory that the cause of plaintiffs' loss was leakage from the corroded Tank 2

fees and prejudgment interest and punitive damages.

## Discussion

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of summary judgment where the moving party shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. The court's function at the summary judgment stage is not to weigh the evidence, but to ascertain whether any genuine issue for trial exists. *American Intern. Group, Inc. v. London American Intern. Corp., Ltd.*, 664 F.2d 348, 351 (2d Cir.1981).

▪ At issue in this case is whether, under the terms of the homeowners' policy, defendant is responsible for covering some or all of plaintiffs' damages which are proved to have resulted from Santa Fuel's misdelivery of fuel oil and resulting damage by oil contamination. Resolving this issue requires interpretation of the insurance policy, a function left to the court under Connecticut law. *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583, 573 A.2d 699 (1990). In *Hammer*, the Connecticut Supreme Court set forth the applicable standard for interpreting an insurance contract:

> An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy.... If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties. If the insurance coverage is defined in terms that are ambiguous, such ambiguity is . . . resolved against the insurance company.

which if proved would undisputedly preclude coverage under this policy.

5. This provision is from endorsement HO–350, which, according to defendant, amended the

214 Conn. at 583–84, 573 A.2d 699 (1990). (internal quotations marks and citations omitted).

Defendant claims that plaintiffs are deprived of coverage by the express terms of the policy, in particular the policy's express coverage exclusion of land, its peril exclusions for losses caused by wear and tear, marring, deterioration and/or by the release, discharge of dispersal of contaminants or pollutants and its loss exclusion attributable to enforcement of law or ordinance. The court will address each of these arguments *seriatim*.

I. *Damage to Land (Defendant's First Affirmative Defense)*

The policy provides in relevant part:

**Section I—Property Coverage**

**COVERAGE A—DWELLING**

We cover:

> 1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling....

This coverage does not apply to land, including land on which the dwelling is located.

. . .

**ADDITIONAL COVERAGES**

> 1. **Debris Removal.** We will pay your reasonable expense for the removal of:
>
> > a. debris of covered property if a Peril Insured Against causes the loss....
>
> 2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.[5]

original "Reasonable Repairs" provision in the policy. The provision in the policy provided: "[w]e will pay the reasonable cost incurred by you for necessary repairs made solely to protect

**3. Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises,** for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises,** Vandalism or malicious mischief or Theft.

Plaintiffs maintain that their claim is only for damage to their residence, specifically excavation and reconstruction of the foundation and basement. (Reinhold Affidavit, ¶ 9, ¶ 12.) Expert reports and billing summaries, appended to the parties' pleadings, identify additional damages and losses. Plaintiffs argue that they are entitled to recover as "reasonable repair" the costs of testing, removal, and disposal of oil soaked soil incident to the excavation and reconstruction of the foundation as necessary to prevent further contamination. Plaintiffs claim that this soil removal from under the foundation was covered under the Additional Coverages section for Reasonable Repairs and Debris Removal as "measures taken solely to protect against further damages" to the dwelling. Plaintiffs proffer the affidavit of Richard D. Louis, Vice–President of Enviroshield, Inc., stating that failure to remove the foundation, cement and soil contaminated with oil would allow the oil to further permeate the foundation, concrete and soil causing further oil and vapor contamination to plaintiffs' home and its foundation. Plaintiffs rely on *Fox v. Nationwide Ins. Co.,* 1988 WL 138695 (E.D.Pa. December 21, 1988), which allowed homeowners coverage for removal of oil contaminated soil resulting from a covered peril under the reasonable repairs policy provision covering repairs done "to protect covered property from further damage if the peril causing the loss is covered." *Fox,* 1988 WL 138695, at 2.

In essence, defendant is claiming that this "soil" should be considered as synonymous with "land" and therefore excluded from coverage, particularly where the policy expressly excluded coverage for "...land on which

the dwelling is located." (Sec. I—Property Coverages, Coverage A.)

■ However, the Louis Affidavit clarifies that the soil removal from under the foundation was done for the purpose of debris (oil) removal, which could not be accomplished other than by removal of the soil into which it had seeped, as the means of preventing further damage to the structure, a specifically identified "Additional Coverage." Because, as the Court discusses in the next section, the contamination resulting from the "syphon effect" and fuel oil seepage following Santa Fuel's mishap in delivery is a loss caused by a "Peril Insured Against," this soil testing and removal appears to constitute a "Reasonable Repair", even though it may incidentally confer an indirect "repair" benefit to land.

Plaintiffs' exhibits varyingly reference damage to a drainage system discharging into wetlands, necessitating ground and well water sampling, waterflow testing, and contaminated soil replacement. However, to the extent that plaintiffs' damage claim against Royal extends beyond this narrow debris removal/damage prevention function, it would be precluded by the policy's coverage limitation excluding losses to land.

■ Similarly, expenses incurred for filling in where a tank(s) was removed implicate the "land" exclusion and would not be recoverable. Therefore, plaintiffs' Motion for Summary Judgment on Defendant's First Affirmative Defense is GRANTED in part, and DENIED in part as detailed above.

II. *Peril Exclusions for Wear and Tear\*Release of Contaminants or Pollutants (Defendant's Second Affirmative Defense)*

The "Definitions" section of the Policy defines "occurrence" as

. . .

covered property from further damages if a Peril Insured Against causes the loss. This coverage does not increase the limits of liability that applies to the property being repaired." Plaintiffs claim that their "file contained no revision, in-

cluding one designated Form HO–350." They argue that even assuming this amendment is effective, the slight change in the language of the amendment does not affect their rights to coverage.

5. an accident, including exposure to conditions, which results, during the policy period in:

a. **bodily injury;** or

b. **property damage.**

6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.

Section I entitled "Perils Insured Against" provides in relevant part:

**Coverage A—Dwelling and**

**Coverage B—Other Structures**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

. . .

2. caused by:

. . .

f. (1) wear and tear, marring, deterioration;

. . .

(5) release, discharge or dispersal of contaminants or pollutants.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

Plaintiffs argue that the contamination exclusion applies only to non-fortuitous, continuous eventualities that occur over time, not to an accidental "occurrence" such as Santa Fuel's negligence. Plaintiffs also contend that under the train of events test, adopted by the Connecticut Supreme Court in *Frontis v. Milwaukee Ins. Co.*, 156 Conn. 492, 242 A.2d 749 (1968), Santa Fuel's negligence was the proximate cause of the contamination. See also, *Jussim v. Massachusetts Bay Ins. Co.*, 415 Mass. 24, 610 N.E.2d 954 (1993).

Defendant responds that whether the leakage was caused by Tank 1 or Tank 2, coverage is excluded, reasoning: if Santa Fuel's improper filling of Tank 1 caused the damage, the losses are excluded under § 2(f)(5); if the leakage from Tank 2 caused the damage, § 2(f)(1) excludes coverage. Plaintiffs do not dispute the latter. Defendant claims that even if Santa Fuel's negligence was the cause of the contamination, the train of events test is inapplicable because the peril caused by that negligence—contamination—is unambiguously excluded by the policy. Defendant cites *Hanover New England Ins. Co. v. Smith*, 35 Mass.App.Ct. 417, 621 N.E.2d 382 (1993) as support.

Under the train of events test, " '[t]he active efficient cause that sets in motion a train of events which brings about a result without intervention of any force started and working actively from a new and independent source is the proximate cause . . . . . [citations omitted]' " *Frontis v. Milwaukee Ins. Co.*, 156 Conn. 492, 499, 242 A.2d 749 (1968). "In the determination whether a loss is within an exception in a policy, where there is a concurrence of two causes, the efficient cause—the one that sets the other in motion—is the cause to which the loss is to be attributed, though the other cause may follow it and operate more immediately in producing the disaster [citations omitted]." *Id.* Thus, under an all risk policy where the efficient cause of loss is a covered risk, coverage is not defeated merely because an excluded risk contributed to the loss or constituted the loss (unless the policy expressly excludes such loss regardless of the antecedent cause).

In *Frontis*, plaintiffs owned a four-story commercial building which shared a mutual system of support with the McGuire Building, using a common party wall. A fire in the McGuire Building, causing extensive damage to its second, third and fourth stories resulted in a partial demolition order directed to those stories which were deemed to have become structurally unsafe. Following removal of these stories and their wall common with the Frontis Building, the Frontis Building itself then lacked adequate lateral support, and the building inspector ordered that its two upper stories similarly be removed.

Answering the question of whether the plaintiffs' loss to the Frontis Building was a "direct loss by fire" within the meaning of the fire insurance policy issued by defendant or was the result of compliance with an order of the civil authority to demolish the two

stories, a loss excluded under the policy, the Connecticut Supreme Court affirmed the trial court's determination that the fire was the active efficient cause of the loss, not the order of the building inspector and the losses were thus recoverable.

In a case with significant similarities to this, the Massachusetts Supreme Judicial Court applied the train of events analysis to conclude that the homeowner's policy exclusion for pollution and contamination was inapplicable. In *Jussim v. Massachusetts Bay Ins. Co.*, 415 Mass. 24, 415 Mass. 24, 610 N.E.2d 954 (1993), the residence adjacent to plaintiffs' had a fuel storage tank in the basement which had been removed and replaced with an underground storage tank. A negligent delivery of approximately 500 gallons of fuel oil was pumped through the disconnected fuel delivery line into the basement of the neighbor's home. The oil seeped out of the basement and migrated underground to the plaintiffs' property, contaminating plaintiffs' well and causing other damage to the plaintiffs' property.

The plaintiffs' homeowners' insurance policy provided coverage for a loss caused by negligence, but as here, excluded coverage for "loss . . . caused by . . . release, discharge or dispersal of contaminants or pollutants." Elsewhere in the policy, the preamble to the policy's general exclusion section which did not reference the pollution peril exclusion, provided "[w]e do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."

The Massachusetts Supreme Court affirmed the trial court's grant of summary judgment for the insured, finding that the train of events analysis applied because the pollution exclusion, unlike the preamble in the general exclusion section, did not specifically exclude losses caused indirectly or by a contributing event, thus, "pollution or contamination caused by an antecedent negligent act is a covered risk." *Id.* at 30, 610 N.E.2d 954. The court noted that if the defendant carrier had included that language in the pollution clause or listed the pollution exclusion under the general exclusion section,

the insured would not have been able to invoke the train of events test.

Here, the "Exclusions" section states "We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." Significantly, the pollution and deterioration exceptions are not listed here.

Defendant's rely on the distinction found by the Massachusetts Appellate Court in *Hanover New England Ins. Co. v. Smith*, 35 Mass.App.Ct. 417, 621 N.E.2d 382 (1993), where the insureds sought coverage for damages caused by oil contamination which followed a malfunction in an electrical relay switch on their oil burner causing oil accumulation which ultimately leaked through the furnace and escaped to the cellar floor where it puddled under and into the insured's family room. The Appellate Court reversed the trial court and upheld the insurer's denial of coverage based upon a contamination exclusion for losses directly "caused by . . . release, discharge, or disposal of contaminants or pollutants," finding that the excluded peril of oil release was the direct cause of the resulting noxious, dysfunctional or hazardous structures or personal property. 35 Mass.App.Ct. 417, 621 N.E.2d 382 (1993). While the rationale as to the inapplicability of the train of events test to an examination of policy exclusions that differentiate between direct and ensuing losses is a bit obscure, the facts here raise no issue of damage *ensuing from* the contamination.

■ The parties agree that the court must resolve whether the pollution exclusion is ambiguous and whether the train of events test applies. The Court concludes that because this policy does not clearly and unambiguously state that coverage for pollution or contamination is excluded without regard to how or why it resulted or what caused it in what sequence, the train of events test is properly applied. This test "distinguishes between an excluded event which causes a loss . . . and a covered event which causes a loss in the form of an excluded event." [citations omitted]. *Hanover* at 420, 621 N.E.2d 382. This case, like *Jussim*, represents the

latter. The accident of Santa Fuel's misdelivery, according to plaintiff's evidence, was the occurrence that set into motion the chain of events or causation in which the last event was the excluded risk of contamination. In other words, the excluded event of pollution was not the efficient proximate cause of the loss, but rather was the loss itself resulting from the covered occurrence.

 Accordingly, plaintiffs are entitled to coverage upon proof that Santa's conduct caused the release of the contaminated oil, and their Motion for Summary Judgment on Defendant's Second Affirmative Defense will be GRANTED.

III. *Loss Caused Directly or Indirectly by the Enforcement of an Ordinance or Law (Defendant's Third Affirmative Defense)*

The portion of the policy captioned "Section I—Exclusions" provides in pertinent part:

> **1.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> **a. Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

Defendant argues that the costs incurred by plaintiffs for the town-ordered removal of Tank 2 from their property were incurred to comply with local regulation. Since recovery for such loss is specifically excluded regardless of the cause or sequence of causation, it is barred. Defendant proffers the Westport Fire Department letter requiring plaintiffs to remove the tank to comply with Connecticut law, which is not disputed by plaintiffs, nor have plaintiffs adduced any evidence to link removal of Tank 2 to the remediation of oil contamination associated with Tank 1. While knowledge of the existence of this tank only became known through the investigation following the Santa Fuel incident, the undisputed evidence shows that actual excavation and removal of the tank was mandated by local ordinance and unrelated to Santa Fuel's conduct. Accordingly, the costs for removal of Tank 2 are not covered under the policy and plaintiffs' Motion for summary Judgment on Defendant's Third Affirmative Defense must be DENIED.

### Conclusion

For the foregoing reasons, plaintiffs' Motion for Summary Judgment on Defendant's Third Affirmative Defense [doc # 14] is DENIED; it is GRANTED as to the Second Affirmative Defense; and is DENIED in part and GRANTED in part as to Defendant's First Affirmative Defense. Defendant's Motion for Summary Judgment on Count One and Four of the Complaint [doc. # 19] is similarly DENIED in part and GRANTED in part.

IT IS SO ORDERED.